J. H. RILEY et al., Appellants, v. H. L. LITCHFIELD et al., Appellees.

**NAMES:   Christian—Rules to Determine—Identity—Intoxicating**
1 **Liquors.**

1. The Christian name of a person may consist of one or more *letters only.*

2. Where one or more *letters* appear as the Christian name they are treated, in the absence of any showing to the contrary, as the Christian name which the person has assumed.

3. There is no presumption that a *letter* or that *letters* stand for *other* names and are not themselves the Christian name.

4. When two or more Christian *names* are used, the middle *name* or *names* or letter is quite generally disregarded, not because they are not a part of the Christian name, but because not essential to the identification of the person.

5. When the given *name* is written, the middle name or letters may be disregarded in identifying the person.

PRINCIPLE APPLIED: Tested by the above rules, *held*, the following names (first column showing names as appearing in the "poll" book, second column showing names appearing on a

"statement of consent" for sale of intoxicating liquors), are not the same:

| | |
|---|---|
| Robert Thorn | R. Thorn |
| Hiram B. Colvin | H. B. Colvin |
| John R. Armstrong | J. R. Armstrong |
| Will G. Lusthoff | W. G. Lusthoff |
| Lee Lovelett | L. Lovelett |

NAMES: Idem Sonans. Names are said to be *"idem sonans"* if the attentive ear finds difficulty in distinguishing them when pronounced, though spelled differently.

PRINCIPLE APPLIED: Arthur Rohweder and Arthur Rohweder are *"idem sonans."*

INTOXICATING LIQUORS: Statement of Consent—Sufficiency—Findings by Court—When Disturbed. The trial before the district court of the sufficiency of a statement of consent for the sale of intoxicating liquors is at law, and the findings of the trial court must be given the force of a verdict of a jury.

PRINCIPLE APPLIED: The name of O. H. Sossman, A. C. Sorenson and H. S. Caward appeared on the statement of consent. It was claimed the same names appeared on the poll books. The trial court found that the poll books showed: "O. H. Sassman, A. C. Sarenson and H. S. Coward" and that they were not the same. The original poll books showed that men might reasonably differ. *Held,* the findings of the court would not be disturbed.

WORDS AND PHRASES: De Novo. The term *"de novo"* as used in Sec. 2450, Sup. Code, 1913, providing for trial in district court of sufficiency of a statement of consent to sell intoxicating liquors, simply means "again" or "anew"—not "as an equity action."

INTOXICATING LIQUORS: Statement of Consent—Incorrect Poll Books—Signatures to Correspond—Identity. If a voter's name appears on the poll book in an incorrect form, he may properly sign a liquor consent statement in such incorrect form, but the evidence must be such that it fairly appears that the incorrect name on the poll book represented and stood for *this particular voter.*

PRINCIPLE APPLIED: The name of *E.* A. Oppelt appeared on the poll book. Only one "Oppelt" voted in the precinct. C. A. Oppelt signed the liquor consent statement by writing the name "*E.* A. Oppelt." He testified that he resided in the city;

that he voted at the last preceding election; that there was no one living in the city by the name of ''Oppelt'' except himself and a son who had never voted; that he did not know whether a person by the name of E. A. Oppelt voted. *Held*, the name should be counted. *Held*, other signatures not aided by like testimony of identity should be rejected.

INTOXICATING LIQUORS:  Statement of Consent—Securing Signatures—Proper Advice—''Reputable'' Person.  That a person securing and making affidavit to signatures to a liquor consent statement is not a ''reputable'' person, within the meaning of Sec. 2452, Code, cannot be predicated on the fact that he in good faith advised a voter to write his name on the statement just as it appears to have been written on the poll book by the clerks of election.

INTOXICATING LIQUORS:  Statement of Consent—Verifying Signatures—''Reputable'' Person—Perjury.  One who commits perjury in the verification of the signatures on a statement of consent for the sale of intoxicating liquors by swearing to signatures (1) of persons who did not sign or (2) without knowing who made the signature, is not a ''reputable'' person within the meaning of Sec. 2452, Code, and all such signatures are thereby nullified.

INTOXICATING LIQUORS:  Statement of Consent—Death of Signers—Removal from City.  A statement of consent for the sale of intoxicating liquors, if filed within 30 days after the signatures are attached thereto, as provided in Sec. 2452, Code, is unaffected by the death or removal of signers from the city within said 30 days.

INTOXICATING LIQUORS:  Statement of Consent—Who May Sign—Poll Books—Right to Vote.  Any person whose name appears on the poll books as voting has the right to sign the statement of consent for the sale of intoxicating liquors as provided in par. 1, Sec. 2448, Sup. Code, 1913, irrespective of his right to vote.

INTOXICATING LIQUORS:  Statement of Consent—Withdrawal of Signature—Reinstating Signature.  One who has executed a withdrawal of his signature from a statement of consent for the sale of intoxicating liquors may, before the same becomes effective by filing, subsequently execute and file a withdrawal of his withdrawal and retain his name on the statement of consent.

*Appeal from Black Hawk District Court.*—HON. GEO. W. DUNHAM, Judge.

SATURDAY, DECEMBER 19, 1914.

APPEAL from a judgment of the district court declaring the statement of consent to the sale of intoxicating liquors in the city of Waterloo insufficient, thereby affirming a like finding of the board of supervisors of Black Hawk County. The appeal is by both parties, that of those presenting the statement being first perfected.—*Affirmed.*

*W. N. Birdsall, H. B. Boise,* and *J. T. Sullivan,* for appellants.

*Wirt P. Hoxie, County Attorney, Reed & Tuthill,* and *Courtright & Arbuckle,* for appellees.

LADD, C. J.—A written statement of consent to the sale of intoxicating liquors in the city of Waterloo purporting to be signed by 3,917 persons who had voted at the last preceding election at which 6,795 votes had been cast was filed with the county auditor, December 17, 1912. Of these, 402 subsequently were withdrawn, 18 names were twice signed, 9 were forgeries, 2 improperly witnessed, 2 were names of nonresidents, and 4 did not appear on the poll books. In addition to these, 36 were not counted because of difference in names on statement from those appearing on the poll books, 23 owing to difference in initials and 26 being declared fictitious names. Deducting these, or 522 names, from the 3,917 appearing on the statement of consent, there remained but 3,395 or 3 less than a majority of the electors voting at the last preceding election.

The appeal by those presenting the statement of consent will be considered first.

1. NAMES: Christian: rules to determine: identity: intoxicating liquors.

I. Thirty-six names attached to the petition of consent were not counted because different from any appearing on the poll books and the correctness of this ruling as to the following names is challenged by appellants:

| Ward | Precinct | Name | Poll No. | Name |
|------|----------|------|----------|------|
| Second | First | Robert Thorn | 307 | R. Thorn |
| Second | First | Hiram B. Colvin | 415 | H. B. Colvin |
| Second | First | John R. Armstrong | 741 | J. R. Armstrong |
| Third | Second | Will G. Lusthoff | 288 | W. G. Lusthoff |
| Fourth | First | Lee Lovelett | 422 | L. Lovelett |

A person's name is the mark or *indicium* by which he is distinguished from other individuals. By universal practice or custom, the designation is composed of the Christian or given name and a surname. The one is given at birth or at baptism, the other is the patronymic derived from the common name of parents. The Christian or first name is in law, and is denominated the proper name. Surnames do not appear to have come into use in England until the middle of the fourteenth century and were not considered of controlling importance until the time of Queen Elizabeth. Because of the given name being conferred by the religious rite of baptism, it was deemed of the more importance, whereas the surname was then usually assumed by the individual or given him by others because of some characteristic or peculiarity. *In re Snook* (N. Y.) 2 Hilt. 566.

Some Christian names were often borne by several individuals, and so the use of the surname was adopted in order to better distinguish the one from the other. Such distinctions were often made by the name of the estate or place where born or of abode or from whence the individual came, or by occupation. The Christian or given name may consist of letters only, though this does not frequently happen,—and there is no presumption that letters stand for other names and are not themselves the Christian name of the party. *Hinkel v. Collins*, 71 N. W. (Mich.) 481; *Andrews v. Wynn*, 54 N. W. (S. D.) 1047; *State v. Cameron*, 29 Atl. (Pa.) 984; *Tweedy v. Jarvis*, 27 Conn. 42; *King v. Hutchins*, 28 N. H. 561, 578; *State v. Webster*, 30 Ark. 166; *Minor v. Georgia*, 63 Ga. 318; *City Council v. King*, 4 McCord (S. C.) 487; *Lomax v. Lan-*

*dells,* 6 C. B. 577; *Perkins v. McDowell,* 23 Pac. (Wyo.) 71; Note to *Laflin & Rand Power Co. v. Steytler,* 14 L. R. A. 690.

Possibly a single letter may have become so commonly used as an abbreviation for the Christian name that in view of other circumstances it will be recognized as such. Thus ''J'' before the surname was held in *Claflin v. City of Chicago,* 53 N. E. (Ill.) 339, to be the abbreviation of John. But generally where a letter or letters appear before the surname they are treated, in the absence of any showing to the contrary, as the Christian name, assumed by the party; for, as parents are under no legal obligation to baptize their children, the first name may be assumed and consist only of a letter or letters. *Tweedy v. Jarvis,* 27 Conn. 42; *City Council v. King,* 4 McCord (S. C.) 487; *Reg. v. Dale,* 15 Jur. 657; *Lomax v. Landells,* 6 C. B. 577.

Where two or more Christian names are used, the middle name or names or letter is quite generally disregarded, though the rule appears otherwise in Massachusetts. *Parker v. Parker,* 146 Mass. 320, 15 N. E. 902.

The middle name or names, letter or letters cannot well be said not to constitute a part of the name, as some decisions declare, but merely are not essential to the identification of the person.

Where the given name is written, then the middle name or letter may be disregarded in identifying the individual and where only a letter or letters precede the surname such letter or letters, in the absence of any showing to the contrary, are to be treated as the given or proper name. It should be added that differences in spelling are of no consequence if this makes no difference in the sound when correctly pronounced.

These rules were recognized in *Wilson v. Bohstedt,* 135 Iowa 451, and *Porter v. Butterfield,* 116 Iowa 725, and it need only be added that the ruling of the court, in holding the above names not the same, was not erroneous.

II. A considerable number of names spelled differently on the statement of consent and in the poll books were counted because of sounding the same. The doctrine of *idem sonans*

**2. NAMES: *idem sonans.*** was held not applicable to seventeen names. As to two of these, we have no difficulty in disagreeing with the district court. One of these appeared on the petition as Arthur Rohweder, and on the poll book as Arthur Rohwweder. Spelled either way, the surname would be pronounced the same. Indeed, it would be difficult to so pronounce the two as to render the sounds distinguishable. E. F. Goodell was spelled alike on both petition and poll book.

As to some of the other names, there is a difference of opinion, but as, on other grounds, we find the statement of consent insufficient, it is unnecessary to review in detail the remaining fifteen. For a collection of authorities, however, see 29 Cyc. 272, *et seq.*

III. The court's finding as to the manner in which the above names and some others were spelled on the poll books is challenged. We have examined these names on the poll

**3. INTOXICATING LIQUORS: statement of consent: sufficiency: findings by court: when disturbed.** books and are inclined to the opinion we ought not to interfere. Were the matter before us for hearing as an equitable action, the writer would be inclined to hold that several of the names rejected were identical with those on the statement of consent. This is true, to illustrate, of O. H. Sossaman, A. C. Sorensen, H. S. Caward and Matt Geib. The second letter of each of the first two on the poll book might well have been read "o" instead of "a" and in the third "a" instead of "o". But the second letter in Caward's name seems almost exactly like the second letter in the others. Had those making affidavits to signatures to the statement of consent appreciated their purpose as being to identify these as the signatures of those signing, some help might have been derived from this source. This is especially true in the case of Matt Geib. His given name on the statement was found

to be Watt though the affidavit described him as Matt and the name so appears on the poll book. Persons examining these reach different conclusions and would be as likely, perhaps more likely, to agree with the conclusion reached by the district judge than otherwise. As persons other than the elector enter his name on the poll books, some liberality is desirable in making comparisons to the end that, while none but electors may be included as signing the statement of consent, as few as possible be denied an expression of their wish without their fault, because of mistakes or oversights of election officers. However, there was room for the findings of the trial court, and, as minds might well differ, such findings must be accorded the effect of a verdict and cannot be disturbed. The proceeding, though special, is at law. *Dye v. Augur,* 138 Iowa 538; *Porter v. Butterfield,* 116 Iowa 725; *Green v. Smith,* 111 Iowa 183.

True, section 2450 of the Code provides that in the district court the matter shall be tried *de novo*. This means no more than that it shall be tried not as before the board of supervisors or on the record there made, but again and as though not previously heard. An analogy is found in appeals from justices of the peace which are tried in the district court anew but always at law precisely as special proceedings, in the absence of any provision contrary, are there tried. No provision respecting appeals in such matters to this court are to be found and therefore these must be on errors as in other law actions. If then, in examining the names on the poll books and comparing them with those on the statement of consent, minds might reasonably differ as to their being the same or different, the finding of the trial court must be accorded the force of a verdict of the jury. For this reason we are not disposed to disturb the findings of the trial court.

4. WORDS AND PHRASES: *de novo.*

IV. Where the names on the statement of consent and the poll books are the same, the identity of the signers with the

electors whose names are on the poll books is presumed.  To

5.  INTOXICATING
   LIQUORS:
   statement of
   consent: in-
   correct poll
   books: signa-
   tures to cor-
   respond:
   identity.

overcome this presumption, twenty-three electors were called by contestants and testified that the names by them signed were not their true names.  On cross-examination, proponents elicited that the change in signature was to make the names conform with those on the poll books and not to deceive.  This was objected to for the reason that the poll books were the exclusive evidence of who had voted.  Appellees insist also that the evidence failed to identify these witnesses with those who had voted under the particular names appearing on the poll books.  All of them were registered in their true name and none of their true names appear on the poll books.  But for all that appears save as to the witness referred to further on, none knew whether other persons resided in the city bearing the names appearing on the poll books.  This being so, it could not well be inferred that these witnesses were the persons intended rather than others, especially since they may as well have been given other initials or names in the poll books.  It was a mere guess or surmise and not sufficient on which to base a finding.  Had others of the same surname who had voted at the election been called and showed that they voted under other names appearing on the poll book, then there would have been room for the inference that the particular person's name was as written therein, especially if it were shown that no other of that name resided within the precinct.  That the elector knew of no one of that name was of little significance unless a showing were made that he probably would have known if there were such.  In *Taft v. Snouffer,* 157 Iowa 461, the identity of the person signing with him whose name was written on the poll book was conceded.  Here the proof was insufficient to do more than show that the particular elector voted and that a name something like his appeared on the poll book and that he knew of no one in the precinct bearing such name.  It is needless to say that this

was not conclusive and in any event did not preclude a finding to the contrary. As to one only was the evidence of this character. C. A. Oppelt, who signed the statement of consent as E. A. Oppelt, the name appearing on the poll book, testified to having resided in Waterloo, to having voted at the last preceding election, that there was no one living in Waterloo by the name of Oppelt except himself and a son by that name, and his son had never voted, but that he did not know whether a person by the name of E. A. Oppelt voted.

In the light of this evidence and in view of the fact that but one Oppelt voted in the precinct, there is but one inference reasonably to be drawn from this evidence and it is that Oppelt was the identical person whose name appeared on the poll book as E. A. Oppelt. All this evidence was objected to as tending to vary or explain the names on the poll books, but such was not its design. The witnesses having been asked by appellees whether their names were as actually signed to the statement of consent and it appearing that they were not, this evidence was adduced to show that, although different, they were not forgeries or fictitious names but those of the identical persons who had voted and their names entered in the poll books precisely as they had signed them to the statement of consent. For this purpose, the evidence was admissible.

V. On the appellees' appeal they contend that the evidence disclosed that several of the canvassers were not reputable persons in that (1) they were guilty of perjury; (2) induced electors to sign names other than their own; and (3) made affidavits to signatures of electors unknown to them. Disposing of the second of these first, it is to be said that a number of electors, upon discovering that their true names were not on the poll books, signed the names to the statement corresponding with those on the poll books which were supposed to have been written for them by the judges of election. This was in pursuance

6. INTOXICATING LIQUORS: statement of consent: securing signatures: proper advice: "reputable" person.

of the advice of those in charge of the campaign and was approved in *Taft v. Snouffer, supra,* and therefore the action of those making affidavit thereto cannot well be criticized.

The first and third grounds may be considered together. Section 2452 of the Code declares that, "The signing the name of another to any statement of general consent provided for in the sections of this chapter relating to the mulct tax, shall be punishable as forgery, and every such statement shall be accompanied by the affidavit of some reputable person showing that said person personally witnessed the signing of each name appearing thereon, and any false statement contained in such affidavit shall be punishable as perjury." The manifest design of this statute was that each signer be identified as the person named, to the end that a genuine statement form the basis of subsequent proceedings.

7. INTOXICATING LIQUORS: statement of consent: verifying signatures: "reputable" person: perjury.

As said *In re Intoxicating Liquors,* 120 Iowa 680, "the object of the legislature in adopting this provision was to secure a genuine statement—that is, one signed by the requisite number of qualified persons—and to furnish the board of supervisors a *prima facie* showing by way of affidavit that the signatures relied on are genuine." The notion of an attesting witness is that a person other than the one signing place his name on the paper or instrument for the purpose of making an implied or express statement thereby that it was then known by him to have been signed or executed by the purported maker. II Wigmore on Ev., Sec. 1292.

And this was the interpretation of the statute by those preparing the form of affidavit used in which the affiants deposed that the person named therein signed "the foregoing statement of consent in my presence and that I personally witnessed his signature thereto." It was not essential that the canvasser make the affidavit; any reputable person may do so provided he is able to identify the individual signing the statement as the person of the name signed. Were less exacted, the making of the affidavit would be an idle and use-

less formality. Several of the canvassers made affidavit to signatures without knowing who made them. One of them estimated that one-third of those signing were strangers and another thought one-half had never been seen by him before or since. Another declared that he did not give the question of identity of the persons with the names signed any consideration whatever.

One B. D. Ryan testified that he procured 200 to 225 signatures to which he made affidavit; that he did not know all of them, probably not over half and never saw them before or since and only knew their names from these being attached to the statement. He had been acquainted with E. F. Patterson, residing at 901½ Sycamore Street, and employed by the Independent Electric Company, for three or four years and had requested him to sign the statement of consent two or three times, but Patterson refused and never did sign it. Nevertheless, Ryan made affidavit that E. F. Patterson signed the statement and that he personally witnessed such signing, and his explanation was that a person whom he did not know and who gave his residence as at a transient hotel signed that name. No reason for thinking such person E. F. Patterson appeared and there is no escape from the conclusion that Ryan was guilty of wilful perjury in making the affidavit. In the instance of Seeland, the evidence is not so conclusive, though he gave no attention whatever to the identity of the person signing the name, and his affidavits to signatures purporting to be those of Albrecht, Neith and Case, none of whom ever attached his name to the statement, were false. Other forgeries were shown and in view of the carelessness of the canvassers, still others may not have been detected. Whatever may be said as to the showing against Seeland, that against Ryan was conclusive and no argument is essential to sustain the conclusion that a person guilty of perjury in the performance of the work under investigation is not a reputable person. Not being such, the signatures witnessed by him should have been rejected. *Taft v. Snouffer,* 157 Iowa 461; *Foster v. Crisman,* 165 Iowa 189.

VI. After signing the statement and before it was filed, several of those who signed died and others removed from the city before the statement was filed and it is insisted by appellees that the names of these should not have been counted on the petition.

8. INTOXICATING LIQUORS: statement of consent: death of signers: removal from city.

The statute provides that as a condition to the taking effect of the mulct law, "A written statement of general consent that intoxicating liquors may be sold in such city, signed by a majority of the voters residing in such city, voting therein at the last preceding election, as shown by the poll list of said election, shall have been filed with the county auditor and shall, 'by the board of supervisors, at a regular meeting, have been held sufficient, and its finding entered of record, which statement when thus found sufficient, shall be effectual for the purpose herein contemplated, until revoked, as hereinafter provided." Section 2448.

Section 2452 of the Code provides that "No name shall be counted that was not signed within thirty days prior to the filing of said statement of general consent." This implies that all signing within the thirty days prior thereto shall be counted and the statute quoted plainly means that the persons signing the statement shall be residents of the city at the time of signing. Some period must necessarily be fixed during which signatures may be procured and we think the thirty days mentioned is that period and that the name having been signed within that time and while a resident, it should be counted.

VII. It appears that some electors voted without being registered. They made the proper affidavits on the day of election and received certificates which were presented to the judges of election at the time of voting but the register was not signed, and for this reason, the appellees contend that they voted illegally and that their names ought not to have been counted. We have repeatedly held that the "poll list of the said electors" is conclusive evidence

9. INTOXICATING LIQUORS: statement of consent: who may sign: poll books: right to vote.

of who voted at the election and those so voting are entitled to sign the petition and be counted. The law does not contemplate the investigation as to who had the right to vote, it being sufficient that his name appeared on the poll lists. The point is not well taken.

VIII. Some 14 electors who had signed the statement of consent executed withdrawals thereof, but subsequently, and before the withdrawals had been filed, executed revocations

10. INTOXICAT-
ING LIQUORS:
statement of
consent: with-
drawal of sig-
nature: rein-
stating signa-
ture.

of the withdrawals and filed such revocations with the county auditor prior to the filing of the withdrawals with that officer. As the withdrawals had been revoked prior to their taking effect, there can be no doubt but that the revocations were effective and that the names were properly counted.

The complaint of appellants that withdrawals filed after the names undertaken to be withdrawn from the statement of consent had been counted is not borne out by the record before us and for that reason is not considered.

It will be observed that the margin of difference between the names on the statement of consent conceded to have been correctly counted, leaving out those procured by Ryan, and the majority of the electors at the last preceding election, is narrow, being but eighty-five, in a city having 6,795 electors. Rejecting the names appearing on the statement of consent witnessed by Ryan, there is left considerably less than a majority, and therefore, the district court rightly held the statement to have been insufficient.

On the grounds stated, we are able to agree that the judgment of the district court should be and it is—*Affirmed*. All Justices concur.