No. 26,289.

THE STATE OF KANSAS, ex rel. WALTER A. BLAKE, County Attorney, *Plaintiff,* v. FRANK L. DUNN et al., *Defendants.*

SYLLABUS BY THE COURT.

MUNICIPAL CORPORATIONS—*Petition for Abandonment of Manager Plan— Number and Qualification of Petitioners.* In a mandamus proceeding to compel the board of commissioners of a city of the first class, having more than 80,000 inhabitants and operating under the city manager form of government, to call an election to submit the question of abandoning the city manager form of government and substituting in its place the mayor and councilmen form of government, upon petition therefor as provided in R. S. 12-1019, it is *held:*

1. That "qualified electors" who may petition are those only who possess the constitutional qualifications of electors and who are properly registered.

2. In determining the number of petitioners necessary the total number to be considered is the total number of electors properly registered.

3. In determining who were properly registered in January, 1925, it was proper to strike from the registration books the names of persons who had previously registered but who did not vote at the general election in November, 1924.

4. It was proper for the board of commissioners to have the city clerk, with such additional clerical force as was necessary, check the names on the petition with the registration books of the city, to see if the petition contained the names of twenty-five per cent of the qualified electors of the city.

5. In so checking the names it was proper to exclude, or not to count: (*a*) names of persons on the petition that were not on the registration books; (*b*) names on the petition with a street address different from that on the registration books; names of (*c*) men and of (*d*) women who did not sign the petition as registered, giving Christian names, instead of initials, or *vice versa,* in the absence of evidence of identity offered by petitioners; and (*e*) names of women on the petition using the prefix "Mrs." followed by initials or masculine Christian names, which did not appear on the registration books, in the absence of evidence of identity offered by petitioners.

6. The statute contemplates that each petitioner personally sign the petition.

7. When the petition consists of several sheets, each sheet must be verified by a signer of that sheet.

Original proceeding in mandamus. Opinion filed March 25, 1925. Judgment for defendants.

*W. A. Blake, John W. Adams, E. L. Foulke, William J. Wertz, George McGill, James A. Conly, George L. Adams, E. L. Wheeler,* and *James Nash,* all of Wichita, for the plaintiff.

*Robert C. Foulston,* and *George Siefkin,* both of Wichita, for the defendants.

The opinion of the court was delivered by

HARVEY, J.: This is an original proceeding in mandamus to compel the commissioners of the city of Wichita to call an election to submit the question of abandoning the present city manager form of government and substituting in its place the mayor and councilmen form of government. The parties have agreed in part upon the facts, and submitted evidence as to matters which could not be agreed upon. From this it appears that the city of Wichita is operating under the city manager form of government provided for by chapter 86 of the Laws of 1917 as amended by chapter 107 of the Laws of 1919 (R. S. 12-1001 to 12-1020). Proceeding under R. S. 12-1019, on January 19, 1925, W. H. Boston and others caused to be filed with the city clerk a petition composed of 298 sheets containing 9,652 names and purported signatures of persons representing themselves to be qualified electors of the city, praying such election. The city clerk on the same day presented the petition to the board of commissioners of the city, who instructed the city clerk forthwith to begin the checking of the names appearing upon the petition as filed against the registration books of the city, and report as soon as possible to the board of commissioners. The city clerk was authorized to employ necessary assistants to check the petition as speedily as possible. On January 31 the city clerk reported to the board of commissioners that he had carefully checked the petition against the registration books as the same appeared on January 19, 1925, and found that there were 6,642 names of qualified electors appearing on the petition whose names corresponded with the registration books. The city clerk in arriving at his report excluded and did not count:

"(*a*) Names not in common with the registration books as to names and
        addresses ............................................................. 1,573
 (*b*) Names corresponding to registration, except as to street address...   87
 (*c*) Names of men who did not sign exactly as registered—given names
        instead of initials, or *vice versa*, although address indicated cor-
        rectly .................................................................   766
 (*d*) Names of women who did not sign exactly as registered, leaving
        out initials or inserting initials and using given names, although
        address given correctly ...................................... 192
 (*e*) Names of persons whose surnames and addresses corresponded to
        the women's registration books, having prefixed thereto 'Mrs.'
        followed by initials or masculine Christian names, which initials
        or masculine names did not appear upon the women's registra-
        tion books ...............................................:..... 405"

The city clerk also reported that it appeared from the petition

there were many names of different persons apparently signed by one person, and from which it was apparent that some of the proposed names were not the true signatures of the persons whose names they appeared to be, but that he had not made any deduction by reason of that fact. He also reported that the election commissioner had stricken from the registration books the names of all electors who had not voted at the general election of 1924, although they had been registered subsequent to January 1, 1924. Upon the report of the city clerk being considered by the board of commissioners, the petitions were deemed insufficient, and upon motion it was determined "that no election be called upon these petitions at this time."

Plaintiff argues that the board of commissioners of the city had nothing to do when the petition was presented but to call the election; that the petition should have been taken at what it purported to be and that the board of commissioners had no authority either to investigate the names on the petition, or to have the city clerk do so. There is no merit in this contention. The statute requires the persons petitioning to be qualified electors. The board of commissioners had no authority to call such an election unless the petition contained the names of twenty-five per cent of the qualified electors of the city. Hence they were bound to examine it to see that it did so before the election was called. Complaint is made that the city commissioners referred the matter to the city clerk, contending that under section R. S. 12-1019 the board of commissioners should pass upon it themselves. Even if that construction were correct, the board of commissioners might employ a clerical force to do the work, and if they chose to commit that to the city clerk, the petitioners could not complain. In this case the board of commissioners did make the decision upon the matter after receiving the report of the city clerk.

Plaintiff contends that the petition was sufficient under the statute, and that the city clerk had no authority to check the same as against the registration books, nor to exclude from the counting of legal petitioners the names of the persons who were excluded. The statute provides:

"Such an election shall be called by the governing board upon the presentation of a petition to the governing board of said city, signed by not less than twenty-five per cent of the qualified electors of such city, praying for such election." (R. S. 12-1019.)

The first question is, Who are "qualified electors" within the

meaning of the statute? It is well settled in this state that the legislature may require registration as a prerequisite to the right to vote. (*The State v. Butts,* 31 Kan. 537, 2 Pac. 618.) In the cities where registration is required, an elector is a person having the constitutional qualifications of an elector and who is duly and properly registered. (*Coney v. City of Topeka,* 96 Kan. 46, 149 Pac. 689.) In *Clayton v. Hill City,* 111 Kan. 595, 207 Pac. 770, the term "qualified electors" was construed to mean persons entitled to vote. Hence the words "qualified electors" in this statute means persons who have the constitutional (Const., art. 5, §§ 1, 4) qualifications of an elector and who are duly and properly registered. Other persons are not authorized to petition for such an election.

The next question is, "Twenty-five per cent" of what number—the total number of votes cast at the last city election (which was 9,427), or the total number of votes cast at the last general election (which was 30,917), or the total number of qualified electors as shown by the registration books (which was 31,327), or the whole number of persons in the city having the constitutional qualifications of voters, whether they were registered or not? This could only be determined by taking a census of the voters, which was not done, but there was testimony that the number is at least 40,000. It will not be necessary to discuss separately the arguments for and against these several theories. When we determine, as we have, that the term "qualified electors" in the statute means persons otherwise qualified as electors who are properly registered, it necessarily follows that the total number of persons to be considered is the total number whose names are properly upon the registration books. The statute fixes its own measure; the only person competent to petition are those whose names are properly on the registration books, and the total number of petitioners must be twenty-five per cent of the total number of names properly upon the registration books.

The next question is, What was the number of names properly on the registration books? By the proviso in R. S. 13-311, all certificates of registration in cities of the size of Wichita expire December 31 of the year preceding the year in which a presidential election is to be held. In accordance therewith, a new set of registration books was started January 1, 1924, and by November 3, 1924, contained the names of 37,200 registered electors. Between that date and January 19, 1925, about 200 persons had registered. After the general election, November 4, 1924, the election commissioner struck

off of the registration books the names of all persons who had not voted at that election—about 6,000—leaving 31,327 names actually on the registration books January 19, 1925. In striking from the registration books the names of persons who did not vote at the general election in November, 1924, the election commissioner acted under the authority of the statute which reads:

"Such registration, when made as herein provided, shall entitle the voter to vote at any election held in such city, and no voter now legally registered, or who shall hereafter be legally registered, shall be required to reregister so long as he or she votes at each general election and continues to reside at the street number at which he or she is legally registered." (R. S. 13-311.)

The election commissioner's authority to do this is questioned. The statute, by necessary implication, requires one who was properly registered at the time of the general election in 1924, but who did not vote at that election, to reregister in order to be entitled to vote. Any ambiguity in the wording of the statute on this point is made clear by examining the earlier statutes, which were revised into R. S. 13-311. This was made up of section 3, chapter 122 of the Laws of 1907; section 1, chapter 214 of the Laws of 1915, Gen. Stat. 1915, §§ 1057, 1058, and sections 1 and 2, chapter 12 of the Laws of 1920. Section 3, chapter 122 of the Laws of 1907 required a registration every two years, but contained a proviso that a voter properly registered should not be required to reregister if he voted at each regular election and continued to reside at the same street number. As this is now written in the body of R. S. 13-311, there is no reregistering every two years for any voter, but a voter properly registered, who votes at each general election and who continues to live at the same street address, is not required to reregister; if he does not vote at any general election, or does not continue to reside at the same street address, he must reregister in order to be entitled to vote. By the proviso to this section, in cities the size of Wichita, a voter must register every four years, even though he has voted at each general election. Hence it was proper for the election commissioner to strike from the registration books the names of persons who did not vote at the general election in November, 1924. This left 31,327 names on the registration books, and twenty-five per cent of those persons must petition for the election. This required the petition to contain the names of 7,832 persons whose names were on the registration books. The petition contained the names of 9,652 persons. If all of these were qualified electors, as that term is

hereinbefore defined, the petition was sufficient. Of the 9,652 names on the petition, 1,573 did not correspond with the registration books either as to names or addresses. These were properly excluded in the count.

There were 87 names on the petition which corresponded to names on the registration books, but whose addresses as given on the petition were not the same as those on the registration books. It was proper not to count those names. They were not qualified electors, for the statute provides:

"Should any registered voter move from one street number to another in such city, he or she will be required to reregister; otherwise he or she cannot vote." (R. S. 13-311.)

On the petition were the names of 766 men and 192 women who did not sign exactly as registered, using Christian names instead of initials, or *vice versa,* or leaving out or inserting an initial, though the surname and address were the same. To illustrate: If a person signed the petition John Henry Smith or John H. Smith or John Smith, giving an address, and a name at that address was upon the registration books as J. H. Smith or J. Smith, or if a woman's name was on the petition as Mary Smith at a certain address, and the name on the registration book at the same address was M. Smith or M. C. Smith, these were not counted. Plaintiff complains of this. It will be noted this is not a question of *idem sonans,* such as this court had before it in *Entrekin v. Chambers,* 11 Kan. 368; *Rowe v. Palmer,* 29 Kan. 337; *The State v. Witt,* 34 Kan. 488, 494, 8 Pac. 769; *The State v. Haist,* 52 Kan. 35, 34 Pac. 453; *Harrell v. Neef,* 80 Kan. 348, 102 Pac. 838; *Puckett v. Hetzer,* 82 Kan. 726, 109 Pac. 285. There is no controversy here over surnames. Neither is it a question whether there is sufficient similarity to impart notice under the recording statutes, such as was before the court in *State Bank v. Kuhnle,* 50 Kan. 420, 31 Pac. 1057. Neither is the question one where proof of identity was offered, as in *The State v. Watson,* 30 Kan. 281, 288, 1 Pac. 770; *The State v. Gordon,* 56 Kan. 64, 42 Pac. 346; *The State v. Johnson,* 70 Kan. 861, 79 Pac. 732; *Armstead v. Jones,* 71 Kan. 142, 80 Pac. 56; *The State v. Chance,* 82 Kan. 388, 108 Pac. 789. Here no proof of identity was offered or taken. Neither are we concerned here with any question arising by service of process upon the proper person, though incorrectly named, as in *Dutton v. Hobson,* 7 Kan. 196; *Case v. Bartholow,* 21 Kan. 300; *The State v. Haist,* 52 Kan. 35, 34 Pac. 453.

The question we have before us is whether dissimilarity in Christian name or initials is sufficient evidence of identity of the person in the absence of proof of identity. Identity of name ordinarily is *prima facie* evidence of identity of person (*Bayha v. Mumford,* 58 Kan. 445, 49 Pac. 601) or, as sometimes stated, raises a presumption of identity of person, which presumption may be strong or weak, depending upon many circumstances (*The State v. Bizer,* 113 Kan. 731, 732, 216 Pac. 303; 22 C. J. 92-94). But a lack of identity of Christian name or initials, in the absence of proof, raises no presumption of identity of person. In *The State v. Taylor,* 15 Kan. 420, it was held that Michael Wandler cannot be regarded as the same person as J. M. Wandler in the absence of evidence to show that they are one and the same person. In *The State v. Woodrow,* 56 Kan. 217, 42 Pac. 714, it was held that in the absence of evidence to show identity of J. S. Reppy with J. I. Rippey, or of J. L. Cecil with J. S. Cecil, they could not be regarded as the same persons. See, also, *Whitney v. Masemore,* 75 Kan. 522, 89 Pac. 914. In *Ferguson v. Smith,* 10 Kan. 396, the plaintiff sued as A. M. Ferguson, and defendants were sued as Frank Smith and E. A. Dunham, partners. It was objected that the Christian names of the parties were not used. The court held this objection to be without merit; that no written instrument is a nullity because a person used his initials instead of his full Christian name, and before a court should set aside proceedings for that reason, notice and an opportunity to amend should be given. In *The State v. Appleton,* 70 Kan. 217, 78 Pac. 445, defendant was charged as F. T. Appleton. There was a motion to quash because the Christian name was not given, nor was it alleged that it was unknown. In holding there was no merit in the question, the court said:

"There was no evidence offered on the hearing of the motion, or at any step in the trial, to show that appellant had any other name than the one under which he was charged." (p. 218.)

It has long been recognized that, from a legal viewpoint, a single letter, or one or more letters used separately, may constitute a Christian name, though the instances are rare in which that is known to be true. In *Regina v. Dale,* 5 Eng. L. & Eq. 360, an objection was made to certain papers because the initials only were used instead of the Christian name. Lord Campbell, C. J., remarked: "I do not know that these are initials; I do not know that they (the persons referred to) were not baptized with these names." That was for-

merly said to be true only when vowels were used (*Lomax v. Landells,* 6 C. B. 577, 581), but that distinction was later disregarded in England and seems never to have been observed in this country. (19 R. C. L. 1330.) In *The People v. Reilly,* 257 Ill. 538, it was held that the court will not assume without proof that letters are initials rather than the full name of the party designated.

Originally there was no such thing, in legal contemplation, as a surname. A person was identified by his Christian name only. (19 R. C. L. 1326; *In re Snook,* [N. Y.] 2 Hilton, 566, 570.) Because of confusion arising from this practice, in the fourteenth century a statute requiring the use of surnames was enacted. Thereafter it was generally held that a person's name consists of a Christian name and a surname, and that the law does not take cognizance of prefixes, middle initials, or suffixes. (19 R. C. L. 1327-1331; 21 A. & E. Encyc., 2d ed., 306-310; 29 Cyc. 264-269.) This rule was mentioned in *Dutton v. Hobson,* 7 Kan. 196, 199, where it was said: "The law knows but one Christian name in its proceedings, and if there are two of that name it must be made to appear on issues properly made up." (p. 199.) But the Christian name may not be one word only, but may be two or more, and for identification purposes one portion may be as important as the other. In *Gibson v. Foster,* 24 Colo. App. 434, it was said:

"The middle name or initial in a person's name has become quite material in modern times, especially as a distinguishing identification of the person. Many persons now have the same Christian or given name, and the same patronymic, family or surname, and it is by the middle name or initial only, in many instances, that the person may be distinguished or identified in writing. . . . There is no presumption that Albert S. and A. L. Deleplane, or that A. S. and A. L. Deleplane, are the same person." (p. 436.)

In *Ambs v. Chicago, St. Paul, Minneapolis & Omaha Ry. Co.,* 44 Minn. 266, it was said:

"But while, under many circumstances, it has been held that a middle initial in the name of a person will not be deemed a material part of his name, it is a matter of common knowledge that very many, and perhaps at this day most, persons bear a double, or more than one, Christian name, and that in the writing of the name one of these is very commonly indicated merely by its initial letter. The use of such initials, in addition to a fully written Christian name, is the most common means by which, in all the affairs of life, persons bearing names otherwise the same are distinguished. . . . The title of land shown or admitted to have been formerly in William H. Brown does not *prima facie* appear to have been transmitted to the plaintiffs by proof of a deed to them executed by William B. Brown. . . . Where different

initial letters are used in the names of persons which are otherwise identical, and upon the identity of which persons the title depends, the party upon whom the burden of proof rests must present some other proof of identity." (p. 270.)

The initial J. does not necessarily stand for John; it may as well mean James, Jacob, Joseph, or any one of many Christian names, and for the same reason M. does not necessarily stand for Mary, but may mean any one of many Christian names. It frequently occurs, as the evidence shows, that several persons of voting age, of the same sex, reside at the same address. It is not at all certain that all of them are registered. Hence when the Christian name or initials on the petition did not correspond with the name as it appeared on the registration books and no evidence of identity was offered, it was proper to exclude it.

In *Riley et al. v. Litchfield et al.*, 168 Iowa 187, the court was considering a written statement of consent to the sale of intoxicating liquors which under the statute was required to be signed by a majority of the voters as shown by the poll books of the last general election. Persons signed the consent as Robert Thorn, Hiram B. Colvin, John R. Armstrong, Will G. Lusthoff and Lee Lovelett from certain precincts, while the names appeared upon the poll books as R. Thorn, H. B. Colvin, J. R. Armstrong, W. G. Lusthoff and L. Lovelett, respectively, and the question was whether those names should be counted. The court held they should not be counted, and in the opinion said:

"A person's name is the mark of *indicium* by which he is distinguished from other individuals. . . . The Christian or given name may consist of letters only, though this does not frequently happen, and there is no presumption that letters stand for other names and are not themselves the Christian name of the party." (p. 191.)

Plaintiff argues that since the petition represented the signers to be qualified electors and the surnames and addresses were as shown on the registration books, the burden is on defendant to show that the petitioners were not qualified electors. We cannot agree with this. The petitioners were required to show that twenty-five per cent of those registered had signed the petition. It is demonstrated that the certificates on the petition cannot be taken with absolute verity, for 1,573 of the names on the petition were not on the registration books at all, and 87 of them showed different addresses, requiring reregistration. Of these 766 men and 192 women, the board of com-

missioners, or the city clerk acting for them, could not tell from the examination of the registration books that they were registered. Obviously the burden was upon the petitioners, to show that the persons petitioning were duly registered, and no such showing was made.

The petition contained the names of 405 women whose surnames and addresses correspond with the registration books, who used the prefix "Mrs." followed by initials or masculine Christian names, which did not appear on the registration books. To illustrate: The name Mrs. C. A. Bourman, 502 S. Emporia, appeared on the petition. The women's registration books showed at that address Lillian Bourman and Martha Bourman, but no C. A. Bourman. The prefix Mrs. is no part of a name (29 Cyc. 267). Married women may, and frequently do, use for their names the initials or Christian name of their husbands with the prefix Mrs., but it does not necessarily follow that Mrs. C. A. Bourman, who signed the petition, is either Lillian Bourman or Martha Bourman, who had registered. There might be living with a man at his address, and bearing his surname, his wife, mother, one or more adult sisters or daughters, any of whom may or may not be registered. As to these names, the board of commissioners, or the city clerk acting for them, could not tell from examining the documents whether or not the petitioner was registered. Upon a similar question, in *Lumber Co. v. Collison,* 97 Kan. 791, 156 Pac. 724, there was both allegation and proof of identity; here there was none. Since no evidence of identity was offered, the names were properly excluded.

Though in checking the petition to ascertain the number of qualified electors whose names were thereon, no deduction was made by reason thereof, we are asked to pass upon two other questions: First, many of the names on the petition were obviously written by the same person. The statute contemplates that petitions of this class should be signed by the respective petitioners; not that some one interested in the project should sign the names of electors to the petition. Second, the petition is not all on one paper, but consists of 298 separate sheets, each having proper form of heading and verification. This is authorized by the statute, which reads:

"The signatures to the petition need not all be appended to one paper, but each signer shall add to his signature his place of residence, giving the street and number. One of the signers of each paper shall make oath before an officer competent to administer oaths that the statements therein made are true as

13—118 Kan.

he believes, and that each signature to the paper appended is the genuine signature of the person whose name it purports to be." (R. S. 13-1711.)

It is stipulated in the agreed statement of facts:

"That of the total of 298 sheets, 244 sheets thereof, containing names, of which 5,202 names were found by the clerk to be in common with the registration books of the city of Wichita, are not verified by one of the signers of each of said sheets, but that the parties verifying the same were signers of some other sheet of the petition filed."

This perhaps came about by one person circulating and procuring signers to a number of the sheets of the petition, and the person doing so signed one of them, but verified all of them which he circulated. Perhaps that is the very thing the statute is designed to guard against. At any rate, it is a requirement of the statute that the person who verifies a sheet of the petition shall be a signer of that sheet. The names on sheets not so verified should not have been counted. From what has been said it necessarily follows that the petition is insufficient.

Judgment will be entered for defendants.