————o————

STATE OF MISSOURI, *ex rel.*, JAMES T. DOBBINS, and three hundred other citizens of Reynolds Co., Mo., Defendants in Error, *vs.* ALLEN SUTTERFIELD, *et al.*, Justices of Reynolds County Court, Plaintiffs in Error.

1. *Judgment, final—What is—Mandamus from Circuit to County Court.*—The judgment of a Circuit Court against the justices of the County Court, granting a writ of mandamus on them to appoint commissioners to select a site for a county seat, is a final judgment from which appeal will lie, notwithstanding the fact, that a proceeding is at the time pending in the County Court in regard to the establishment of a county seat. The judgment is a finality as to the Circuit Court. (McVey vs. McVey, 51 Mo., 406; Thomas vs. Drennan, 41 Mo., 289.) This proposition is not in conflict with Tetherow vs. Grundy Co., 9 Mo., 118.

2. *Elections—Removal of county seat—"Two-thirds" vote—Construction of Constitution.*—The State Constitution, Art. IV, § 5, prohibits the removal of a county seat unless "two-thirds of the qualified voters shall vote in favor of such removal," and the same instrument provides for the registering of voters. The statute relating to the same subject, (Wagn. Stat., 405, § 22) requires a two-thirds vote of the "legally registered voters," to warrant the transfer. *Held,*

that two-thirds of the votes cast at an election on the question of removal, would be insufficient, under the law, to authorize the change, unless they numbered two-thirds of all the qualified voters of the county.

8. *Stare decisis—Rule, when binding.*—This court will hesitate to interfere with previous adjudications, where on the faith of such decisions, property has been acquired or money invested.

### Error to Reynolds Circuit Court.

*J. L. Detchemendy*, on motion to dismiss.

I. The motion to dismiss ought not to be sustained, because there is a final judgment of the Circuit Court of Reynolds County, Missouri, from which the plaintiffs in error have appealed. The cases of Dunklin County vs. District Court, 23 Mo., 449, and the State vs. Lafayette County Court, 41 Mo., 221, and other cases decided by this court have no application, for the plaintiffs in error in the case at bar, are not asking for the remedy by a writ of mandamus, but for a review of an erroneous judgment of an inferior court, by the mode known to the law, and of which this court has full and complete jurisdiction. The statutes do not make any discrimination or difference between a writ of mandamus to remove county seats and any other cause or party or parties whatever, as to the right of appeal. (State vs. Bollinger Co. Court, 48 Mo., 475, and cases there cited.)

II. A county seat cannot be removed, " unless it appears, affirmatively, that," two thirds of all the legally registered voters of the county, at a general election, have " actually " voted in favor of such removal. (Const. Mo., Art. 4, § 30; Wagn. Stat., 405, § 22; State vs. Clark Co. Ct., 41 Mo., 44; Cocke vs. Gooch, Sup. Ct., Tenn. [April Term], 1871.)

*Chase & Howell, and Finkelnburg & Rassieur*, for Defendants in Error, on motion to dismiss.

I. The action of the court below ordering the appointment of commissioners, was not a final judgment or decision upon which a writ of error will lie. It was an incidental and collateral judgment or order, while the principal proceeding was in progress and remained unfinished. The main proceeding

was the statutory one for removal of seats of justice, and the order appointing commissioners, so far from being the last is one of the first steps in this proceeding. (Tetherow vs. Grundy Co. Court, 9 Mo., 118; State vs. Clark Co., 41 Mo., 44; George vs. Craig, 6 Mo., 648.) The statute provides (§ 29) that the commissioners shall report to the Circuit Court, whereupon the Circuit Court may approve such report, and if it is likewise approved by the County Court, then it becomes a finality and not before. If an appeal would lie at all upon such a proceeding, it would only lie in case of a final judgment. (Wood vs. Phelps Co. Court, 28 Mo., 119.)

II. But the law does not contemplate any appeal or writ of error in such cases at all. (Wood vs. Phelps Co. Court, 28 Mo., 119; Tetherow vs. Grundy Co. Court, 9 Mo., 118.) And plaintiffs in error cannot do, by an indirect proceeding in this case, what the law does not permit them to do directly. The vote was sufficient, although there were not two-thirds of all the votes cast at said election, there being two-thirds of all those who voted on this proposition. All those who did not vote on the proposition of removal are presumed to acquiesce. (State vs. Binder, 38 Mo., 450; State vs. Mayor, 37 Mo., 270; Dil. Mun. Corp., 65; Rex vs. Foxcroft, 2 Burr., 1017.)

NAPTON, Judge, delivered the opinion of the court.

Dobbins and three hundred other citizens of Reynolds county, applied to the Circuit Court of that county for a mandamus on the county justices, to appoint commissioners to select a site whereon to locate the seat of justice.

To the writ, which was issued, the County Court returned that at the general election held on the 5th of Nov., 1872, the proposition to remove the seat of justice of Reynolds county from its present location, did not receive "two-thirds of the legally registered votes of Reynolds county," nor were two-thirds of the legal voters of said county polled at said election as appeared by the returns of said registration and election; that at a registration held for said county within 60 days preceding

the 10th day prior to said Nov. 5, 1872, six hundred and ninety-four (694) voters legally registered in said county; and that the proposition to change the county seat received only 244 votes out of 694 legally registered voters, and out of 547 votes actually polled at the said election.

As a further answer, the court averred, that there had not been raised by a tax, sufficient money from the people to pay for all the lots and improvements sold by the county at Centreville, the present seat of justice, which had been located for twenty-eight years past, and was within five miles of the center of Reynolds county, and that no petition for the removal of said county seat had been presented within ten years after said seat of justice had been located.

This return on demurrer, or rather on a motion to strike it out and disregard it, was held insufficient, and a peremptory mandamus was awarded. To this judgment a writ of error, was taken.

A motion is made in this court to dismiss the writ of error, because there was no final judgment in the case, and to sustain this, various authorities are cited to show that a writ of error only lies on a final judgment, and that this judgment is not final.

But there is no force in this objection. The judgment of the Circuit Court ordering the peremptory mandamus is the end of the case, so far as that court is concerned. Its jurisdiction is certainly exhausted, and the question it decided is gone forever from its control. That a proceeding is collaterally going on, still pending in the County Court in regard to the establishment of the county seat of Reynolds county is a fact, which does not impeach the finality of the judgment of the Circuit Court on the mandamus. What is meant by a final judgment is, that it is final so far as the court which rendered it is concerned, and that court is one to which a writ of error will lie to this court.

It has been frequently held by this court that in proceedings for partition, an appeal would not lie from a judgment *quod partitio fiat*, because it was virtually interlocutory in its

character, and might, upon the coming in of the commissioners appointed to make the partition, be ultimately disregarded. The judgment in that case is not final, as the court in which it is rendered still proceeds with other branches of the same case. But a judgment of peremptory mandamus in a proceeding or application, which in many respects is like any other civil suit, and is attended or may be attended with all the forms of pleading and trial of issue incident to any other action, is a final judgment in that proceeding, and is not the less so because what may be done by the court against which it is issued, in pursuance of the mandamus or otherwise, may still be pending. This point was so ruled in McVey vs. McVey, 51 Mo., 406, and in Strouse vs. Drennan, 41 Mo., 289, and is not in conflict with the decision referred to of Tetherow vs. Grundy county, 9 Mo., 118.

The question remains whether the County Court in deciding on the construction of the statute regulating their action in regard to this matter was wrong; assuming that the rule laid down in Castello vs. St. Louis county, 28 Mo., 259, is correct, and that where the inferior court, on a preliminary question arising on a statute, misconstrues it, this court may compel by mandamus the inferior court to proceed with the case.

The constitution of this State (Art. IV, § 30) says: "The General Assembly shall have no power to remove the county seat of any county, unless two-thirds of the qualified voters of the county, at a general election, shall vote in favor of such removal."

The statute on the subject (Wagn. Stat., 405, § 22) says, after providing for an election: "If it shall appear by such election that two-thirds of the legally registered voters of said county are in favor of the removal of the county seat of such county, then the County Court shall appoint five commissioners," etc.

In this case, as it appears from the return of the County Court to the mandamus, the registration immediately prior to the election showed that there were in Reynolds county 694 voters, that 547 of these duly registered voters actually voted

at the election, and only 244 voted for the removal of the county seat. It appears from the statement of the petitioners, which we will assume to be correct, that only 47 votes were cast against the removal. The County Court decided that 244 was not two-thirds of 694, nor of 547, and as the constitution required that two-thirds of the qualified voters should vote for such removal, they refused to appoint commissioners or proceed further in the matter. The Circuit Court held that, as 244 was two-thirds of 291—all the votes cast on the question of removal—the requisite constitutional majority was obtained.

There is no doubt that in general, where an election is held to determine the choice of a candidate or the determination of some question of public policy, the plurality required by the law, whether it be a bare majority or two-thirds or three-fourths, is determined by the result of the vote cast, without regard to the number of voters declining to vote, and this is upon the ground that the failure to vote is assumed or may be presumed to be an acquiescence in whatever result may be produced by the action of those who feel sufficient interest in the election to go to the polls and vote, and for the further reason that in most cases there is no mode by which the number of absentees can be ascertained. The decision of Lord Mansfield in Rex vs. Foxcroft, 2 Burr., 1017, is therefore rightly followed in many cases in this country where it might be properly applied. But the decisions in England, or in the other States, are very unsafe guides, where we are called upon to construe a constitutional or statutory provision of our own State. If the language is plain and unambiguous, its requirements cannot be set at naught upon the strength of decisions elsewhere on statutes or constitutions, essentially variant or couched in very different terms:

Our constitution, in regard to the proposed removal of county seats, it seems to me, hardly admits of two constructions. It prohibits the legislature from removing them, unless two-thirds of the qualified voters shall, at a general election, vote for the removal. The words do not imply an ac-

quiescence or a negative sanction, or a negative assent inferred from absence, but a positive vote in the affirmative, and the number of votes required is specifically named, and there is no difficulty in ascertaining what that number is, since the same constitution provides for a registration, and points out who the qualified voters are; and the statute in this case uses the words, "legally registered voters," and requires two-thirds of them to vote for the change; and the return of the County Court produces the registration and shows that not one-half of the registered voters voted for the change, and not one-half of the voters who voted at the election voted for it. With what propriety, then, can it be said, that two-thirds of the qualified voters voted for the change.

We are referred, however, to two decisions of this court, (Bassett vs. The Mayor, &c., 37 Mo., 270, and the State vs. Binder, 38 Mo., 450) which are supposed to maintain views conflicting with this opinion. We should hesitate to interfere with previous adjudications of this court, if on the faith of such decisions, property had been acquired or money invested. The views of the court on this subject have already been expressed in the case of Smith vs. Clark Co., *ante* p. 58. But a reference to these cases will show that neither of them arose on the construction of a provision of the constitution or on the subject matter now under consideration. The act of the legislature referred to in the case of Bassett vs. The Mayor, &c., required the question of borrowing money to be submitted to a vote of the qualified voters of St. Joseph, and required two-thirds of such votes to sanction the same. It appeared that there was no registration of voters in the city, and the only guide to determine the number of qualified voters was the result of the last election, which preceded the one in question, and according to that there were only 338 voters in the city, and at the election in controversy, 336 votes were in favor of the loan, and only 58 votes against it. In the case of the State vs. Binder, an act of the legislature, authorized certain municipalities to permit the sale of liquors on Sunday whenever authorized by a majority of the legal

voters of the municipality to do so. An election was held at which a majority of those voting were for the permission, and this was held to authorize an ordinance allowing such sales. But in the State vs. Winkelmeier, 35 Mo., 103, it was held, that where an election was held at which 13,000 votes were cast, a vote of 5,000 on a specific question submitted was not the vote of a majority, though only 2,000 votes were cast against the proposition specifically put. So that we have two decisions one way and one the other, and the last is exactly in conformity with the facts on the record in this case. The return of the county justices shows that not even a majority of the votes cast were for the removal.

In none of these cases, however, was there any examination of, or construction given to the precise language of the constitutional provision now under consideration. The two cases last named were upon temporary acts of legislation, in which a construction either way was not of importance, as a subsequent legislature could readily do away with any inconvenience which might arise from incorrect or unacceptable constructions.

The present case, however, suggests very different considerations. The question of removing county seats was regarded by the framers of our constitution, as of sufficient importance to require very stringent provisions in that instrument, and an examination of the laws in force on this subject, at the time of the adoption of this new constitution, will show the great importance of requiring a strict compliance with its provisions.

It will be observed, that the return in this case shows—and the facts stated in it are admitted—that the county seat of Reynolds county was permanently located in 1845, twenty-eight years ago, and no attempt has been made to remove it to another place till the present movement; that it is located also within four miles of the center of the county—and no tax has been levied to pay for the lots or improvements in the present county seat—for the constitution now forbids it.

At the time this location was made, and from that time till

the new constitution was adopted, the law required three-fifths of the taxable inhabitants, to institute proceedings, and a majority of the inhabitants of the county who paid taxes on lands or were householders, to sanction a removal. It was also provided, (§ 34, R. C., 1855, p. 518–19) that "when a county seat shall have been located within five miles of the center of a county, and shall have continued to be the county seat for the term of ten years, and no petition within that time, made in good faith, and signed by at least a majority of the taxable inhabitants of the county, praying for the removal of the seat of justice, shall have been presented, the same shall not thereafter be removed, unless the County Court will first raise a tax sufficient to pay the appraised value of all lots and the improvements thereon, at such county seat, which the holders thereof may desire to relinquish to the county."

The concluding clause of the section of the constitution which has been heretofore copied, says: "No compensation or indemnity for real estate or the improvements thereon, affected by such removal, shall be allowed."

Thus it will be readily seen that questions of vast importance and presenting some difficulty, may arise in removals of county seats, such as the one in the county of Reynolds. No authority is needed to sustain the proposition that constitutions cannot impair contracts or divest vested rights any more than legislative enactments, and the question will arise whether any vested rights will be disturbed, in case a *bona fide* vote of two-thirds of the people of the county shall favor the contemplated removal, without any attempt at compensation. The question is made and presented by the record in this case —but it has not been investigated nor is it intended to intimate any opinion on the subject—as the decision of the point already examined disposes of the case.

There is no doubt that these municipal corporations, such as counties, are subject to the will of the legislature, and may be altered or abolished at pleasure—and that county seats may be changed, notwithstanding previous laws declaring them perpetual—but a legislature may make contracts as well

as individuals, and if rights of property are vested by an act of the legislature, they cannot be destroyed by subsequent enactments. Whether any such rights would grow out of the laws of 1855 and prior ones, is a question we have not examined. The subject is very fully discussed in Armstrong vs. The Board of Co. Coms., 4 Blackf. Ind., 209. I merely mention it to show the importance of our enforcing a strict observance of the constitutional and legislative requirements, preliminary to a change which necessarily in all cases more or less affects the value of the property at the old county seat, and gives rise to litigation, expensive, tedious, and of uncertain results.

The judgment of the Circuit Court is reversed. The other judges concur.