Patrick v. Johnson.

JAMES S. PATRICK, *Appellee*, v. HENRY JOHNSON et al., *Appellants*.

No. 18,716.

SYLLABUS BY THE COURT.

COUNTY SEAT—*Removal from Santa Fe to Sublette—Number of Votes Required.* To relocate and remove a county seat where buildings costing at least ten thousand dollars have been erected for county-seat purposes, or when such county seat has been eight years or more continuously at any one place by a vote of the electors of the county, three-fifths of the legal electors voting on the question of relocation must vote in favor thereof, but it is not essential that three-fifths of those whose names appear on the registration list shall thus vote.

Appeal from Haskell district court. Opinion filed June 7, 1913. Affirmed.

*C. G. Dennis,* county attorney, *Edgar Foster, William Easton Hutchison, C. E. Vance,* and *A. Schulman,* all of Garden City, for the appellants.

*T. W. Marshall, Herbert Rhoades,* both of New Ulysses, and *H. W. Stubbs,* of Satanta, for the appellee.

The opinion of the court was delivered by

WEST, J.: The plaintiff sued to enjoin removal of the county offices from Santa Fe to Sublette. A demurrer to the petition was overruled and the defendants appeal. It was alleged that at a recent election in Haskell county the registration list contained the names of 513 persons, 427 voting, 245 of whom were in favor of Sublette and 182 in favor of Santa Fe. The plaintiff contends that it was not only necessary that Sublette should receive a majority of the votes registered, but also that it should receive three-fifths of the number of votes shown by the registration list. The defendants insist that a majority only of the votes cast is sufficient and that the provision requiring a three-fifths vote is void.

Chapter 26 of the General Statutes of 1868 provided that in a case like this the board of county commissioners, on petition of three-fourths of the legal electors of the county, should order an election for relocation of the county seat, the number of legal electors to be ascertained from the last assessment rolls. A majority of the votes cast was declared sufficient. In case no place received a majority of all the votes cast a second election was required to be held on the second Tuesday thereafter, the balloting then to be confined to the two places which had received the highest number of votes at the preceding election. Chapter 94 of the Laws of 1879 amended section 2 of this act, making slight changes in the number of petitioners required, but none in the number of votes required. Chapter 89 of the Laws of 1881 provides for the "registration of electors at elections for permanent location or relocation of county seats," and requires the preparation of a registration list before the holding of an election, such list to be used on election day and to constitute and be known as the register of election, the name of each voter thereon to be checked as his ballot is cast. No one whose name is not on the list can vote unless he furnishes proof to the election judges of his residence and right to vote. The list and poll books are to be returned together to the township clerk and a duplicate to the county clerk. A significant feature is the requirement that the list be prepared "on Tuesday, three weeks preceding any election" (§ 1), and revised "on Tuesday of the week preceding the said election" (§ 4). Significant because the act of 1868 is still unchanged and still requires the election to be held within fifty days after presentation of the petition, and the commissioners are still required to give thirty days' notice. Hence it can not be plausibly contended that the registration list was meant for petition purposes, as it need not and can not be prepared until after the thirty days' notice has begun and still longer after the

petition has been presented. In view of the language used in this act, and what was said in *County-Seat of Linn Co.*, 15 Kan. 500, there is ground for arguing that this registration list must have been intended for the purpose of ascertaining in an official way who the qualified electors are. It was said in the syllabus, and repeatedly in the opinion, in substance, that as the legislature had made no provision for a registration it might provide that the place receiving a majority of the votes cast should become the county seat. Now that it has so provided, there is force in the contention that this list is to be a roster of the legal electors, who alone have the right to vote. Added evidence of such intent is found in the provision of section 1 of chapter 91 of the Laws of 1883, that no proceeding or pretended election for the relocation of any county seat had or held since the taking effect of the act of 1881 "shall be deemed or held to have been an election within the meaning of this act, unless registration was had, as required by the terms of said chapter 89." It must be conceded, however, that the legislature has nowhere expressly declared, and we hold it unnecessary, that the majority of legal electors shall be determined by an examination of this list, as there are other abundant and sufficient reasons for requiring registration which may have actuated the lawmakers.

Chapter 91 of the Laws of 1883—"An act to amend section 1 of chapter 94 of the Session Laws of 1879, and sections 4 and 7 of chapter 26 of the General Statutes of 1868, relating to the location and removal of county seats"—so amended section 1 of the act of 1879 as to require "a vote of three-fifths of the legal electors of such county to relocate the county seat and remove it from such place." (§ 1.) Section 4 of the act of 1868, providing that for the purposes of that act the number of legal electors should be ascertained from the last assessment rolls, was amended by reënactment and by

adding the words "and no petitioner shall be deemed a legal elector unless he be an elector and his name appears on said rolls." (§ 2.) This language shows conclusively that for the purpose of petitioning the signers must be legal electors and their names must also be on the assessment rolls. Section 7 of the act of 1868, relating to a second or subsequent election, was amended (§ 3) in a way not material here.

The defendants' contention that the act of 1883 is void is based on the proposition that its title purports to amend only certain sections of former acts specifically designated, and that the section which was amended by inserting the three-fifths provision not only made no reference to the requisite number, but was itself an act to amend a specific section of a former act referring entirely to petitioning for and calling elections, and not to the determination of their results; that in so far as the act purports to go outside of the question of calling an election it goes beyond the limits of its title; that it does not purport to be a general act on the subject of location and removal, but only to amend certain specified sections which never had any reference to the majority necessary for a relocation. The provision of section 6 of the original act (Gen. Stat. 1868, ch. 26), that the place receiving the majority of all the votes cast should be proclaimed the county seat, is left apparently unamended and unrepealed. In other words, we have an original act providing for the location and removal of county seats upon a majority of the votes cast at an election therefor. One of its sections, relating only to the petition and call for election, is amended, and this in turn by a subsequent act whose title gives no hint of adding the further subject of the requisite vote to insure a removal. To the writer there is much force in the suggestion that this subject is not expressed in the title of the act of 1883, which is not an act concerning the location and removal

of county seats, but an act to amend certain specific sections relating to that subject, which sections have nothing whatever to do with the necessary number of votes. But the court is of the opinion that this is too literal and limited a construction, and that the manifest purpose of the legislature was to avoid frequent county-seat controversies by requiring in such cases as this a three-fifths vote, and that the subject embraced in the act of 1893 is germane to the original statute amended and amounts to the latest expression of the legislative will. Another thing of significance is the fact that by the express provision of this act a three-fifths vote is required only in case buildings costing at least $10,000 have been erected "or when such county seat has been eight years or more continuously at any one place by a vote of the electors of any county" (Laws 1883, ch. 91, § 1), a condition not found in any previous statute and evidently inserted for the purpose of meeting some particular situation contemplated by the draftsman of the bill, and the situation arising here, as shown by the allegations of the petition. In *Stephens v. Ballou,* 27 Kan. 594, holding that the amended section will not modify or repeal by implication any other sections of the former act, unless it is clear beyond all reasonable doubt that such is the case, it was said (p. 601) that if the provisions of the old and new acts can be reconciled by any possible mode of interpretation or construction so that each can be given effect under any circumstances, it should not be held that one overturns the other, but both should be given effect. It would seem, therefore, that in counties not coming within the provisions just mentioned a majority will suffice, while in others a three-fifths vote is indispensable, so that the different provisions of the two acts may be given force and meaning as different situations are presented. In *The State v. Thomas,* 74 Kan. 360, 86 Pac. 499, certain sections of an act giving a jury in contempt cases

and restricting the power of judges therein were sought
to be amended under a title referring to the former act
as one "relating to contempt of court and proceedings
therein" (p. 367), but correctly naming the chapter.
It was held that this reference to the former act, while
somewhat inaccurate, was good enough to keep the
searcher for the law from going astray.

The argument is advanced that as silence gives con-
sent, the electors who did not vote presumably had no
objection to the relocation of their county seat, and
that the consent of a majority of the legal electors is
sufficiently shown by a majority of those actually vot-
ing. This rule was suggested in the Linn county case
(15 Kan. 500) but not announced. A somewhat an-
alogous proposition was favorably considered in
*Comm'rs of Marion Co. v. Winkley,* 29 Kan. 36. In
*The State, ex rel., v. Echols,* 41 Kan. 1, 20 Pac. 523, the
statute required a majority of the votes cast, which
was held to mean the votes cast on that particular
proposition only. In the case of *In re Davis,* 62 Kan.
231, 61 Pac. 809, these decisions were referred to and
not disturbed, but it was said:

"The way for an elector to signify his favor for a
candidate for office, or for a proposition to be voted on,
is to cast a ballot for him or for it. . . . He may
be bound in some cases by the action of the majority
by failing to dissent from it, but not where the law, in
order to bind him, requires the expressed assent of a
majority of the whole of an ascertainable number,
which is the case under the law we are considering."
(pp. 239, 240.)

The act there considered provided that "if a majority
of the electors . . . voting at such election shall
favor the creation" (p. 234) of the court it should be
established. In *Gardner v. The State,* 77 Kan. 742, 95
Pac. 588, the act under consideration required a ma-
jority of the voters of each district to vote to unite in
order to form a union school district, and it was held

—90 KAN.                +

that a mere majority of those attending the meeting was not sufficient. It was said:

"In district No. 7 just half the voters voted to unite with district No. 8. They could not bind their neighbors. It required a majority, and the proposition lost." (p. 749.)

While there are many decisions of other courts in line with the argument suggested, including *County of Cass v. Johnston,* 95 U. S. 360; *St. Joseph Township v. Rogers,* 83 U. S. 644; *Carroll County v. Smith,* 111 U. S. 556, and *Taylor v. McFadden,* 84 Iowa, 262, 50 N. W. 1070, this court has never expressly followed this rule, but in each case has endeavored to ascertain the real intent by the language used. In *State, ex rel., v. Sutterfield, et al.,* 54 Mo. 391, it was decided that under a constitution prohibiting the removal of a county seat unless two-thirds of the qualified electors should vote in favor of such removal, and providing for the registering of voters, and a statute requiring a two-thirds vote of the legally registered voters, two-thirds of the votes cast would be insufficient unless they numbered two-thirds of all the qualified electors of the county. It was said in the opinion (p. 396) that the general view that failure to vote indicates acquiescence, and many English and American decisions are unsafe guides in construing local constitutional and statutory provisions. A novel situation was presented in *County-Seat of Osage Co.,* 16 Kan. 296. An election was held to change the county seat from Burlingame, which received no votes. Three other towns were voted for, but none received a majority. A second election was ordered and the voting restricted to the two places which had received the highest votes. One received 1131, the other 1049, and a third 298, so that none received an actual majority of the votes cast. The commissioners ignored the vote for the third town, and declared the higher of the other two the county

seat. This was held correct, on the theory that each election clearly showed the consent of a majority to change from the present county seat. No question seems to have arisen as to the majority of the legal electors.

The act of 1883 provides that "it shall require a vote of three-fifths of the legal electors of such county to relocate the county seat and remove it from such place." (§ 1.) Whether or not this necessitates a favorable vote by three-fifths of all the legal electors of the county, it certainly does require a favorable vote by three-fifths of those actually voting on the question, and means the same as if it read, "it shall require a vote to relocate by three-fifths of the legal electors." As Sublette failed to obtain the required vote, the county seat can not be removed.

. The order overruling the demurrer is sustained.