No. 37,110

Oral A. Dunn, Moss Jensen and Mildred Dreyer, *Appellees*, v.
Board of County Commissioners of The County of Morton,
and Irene Kuder, Clerk of the District Court, *Appellants*.

(194 P. 2d 924)

*Shelley Graybill,* of Elkhart, argued the cause, and *Oscar F. Perkins,* of Elk-
hart, was with him on the brief for the appellants..

*Charles Vance,* of Liberal, argued the cause, and *L. L. Morgan,* of Hugoton,
and *Wm. H. Burnett,* of Hutchinson, were with him on the brief for the
appellees.

The opinion of the court was delivered by

HOCH, J.: This was an action to enjoin the removal of the county
seat of Morton county from Richfield to Elkhart. The action was
brought by three plaintiffs "on their own behalf as citizens, electors
and taxpayers of Morton county, Kansas, and on behalf of the
other members of such class," the defendants named being the
board of county commissioners and five other county officers. The
plaintiffs prevailed and the defendants appeal. By demurrers to
the petition and to the plaintiffs' evidence, and by motion for a new
trial, all overruled, the issues here presented were properly raised
in the lower court.

The principal contentions of the appellants are: First, the plain-
tiffs were not entitled to bring the action; second, the challenge by
plaintiffs of the validity of the election involved a collateral attack
on the composition of the board of county commissioners which
they were not empowered to make; third, the trial court erroneously
computed the number of legal electors of the county, and fourth,
the entire vote in two precincts should have been excluded on ac-
count of irregularities.

The controversy out of which this litigation arises was before
this court in *Dunn v. Morton County Comm'rs,* 162 Kan. 449, 177
P. 2d 207. (Opinion filed Feb. 7, 1947.) The action in that case
was brought to enjoin the holding of an election called on a proposal
to relocate the county seat and was brought under the provisions
of G. S. 1935, 60-1121. Injunctive relief was denied. Syllabus 3
in that case reads:

"It is a principle of general application that courts will not enjoin the call-
ing and holding of an election."

That holding has no applicability here, since the instant action is not to enjoin an election but to enjoin the moving of the county seat, and is brought under a special statute relating to the contest of county-seat and certain other elections. (G. S. 1935, 25-1501 to 25-1510, incl.) In view of what is later said herein, it will be unnecessary to discuss whether other holdings in the former case are here applicable.

No helpful purpose would be served by reciting in full the many allegations of the various pleadings that were filed. This is especially true in view of the issues upon which the appeal is being determined. The plaintiffs filed a petition and an application for temporary injunction, an amended and supplemental petition, a second amended and supplemental petition, another amended and supplemental petition, a second amended and supplemental petition, and an amendment to the second amended and supplemental petition. The defendants filed a motion to strike certain portions of the petition and later a demurrer to the petition, and a motion to strike many parts of the petition, and an answer. Many of the allegations relate to questions not here considered. It will suffice to say that the original petition alleged that those who called the election did not constitute a lawful board of county commissioners; that the petition, as reformed, alleged that the petition for the calling of the election which was presented to the board December 2, 1946, bore the names of many persons who were not residents or electors of the county; that many of the signatures were not genuine; that the board made an examination of these petitions and found that they were not signed by two-thirds of the legal electors as the law requires; that at the purported election, held on January 20, 1947, the returns on which were canvassed by the board on January 25, 1947, the votes of a number of persons not entitled to vote were received and counted; that a number of ballots were counted which were void by virtue of bearing identifying marks, and other allegations of a similar nature. In their answer the defendants alleged in substance that the election was properly called and properly held, the returns properly canvassed, and the board properly proclaimed that by such election the county seat was removed to Elkhart. Defendants further alleged that the plaintiffs were not entitled to bring the action; also that certain votes were illegally counted, and that one or more votes cast in favor of removal of the county seat were not counted, and that the illegal votes

counted against the removal were more than sufficient to offset any purported illegal votes counted for such removal. The reply was a general denial.

It was not contended that the plaintiffs were not citizens, electors, and taxpayers of Morton county, and it was agreed that the Morton county situation brings it within the classification in the first proviso of G. S. 1945 Supp, 19-1602, wherein it is provided that "it shall require a vote of three-fifths of the legal electors of such county to relocate the county seat . . ." It is also agreed that the board of county commissioners, which canvassed the returns of the election and proclaimed the result, was the legally constituted board.

The case went to trial and extensive evidence was received including the poll books from all precincts in the county.

After having had the case under advisement for several weeks, the court made thirty-eight numbered findings of fact and fourteen numbered conclusions of law. Defendants' motion for modification of the findings was overruled and judgment entered, permanently enjoining the defendants from removing the county seat. A motion for a new trial by defendants set up substantially the same contentions previously made in their demurrers to the petition and to the evidence, and their motion for modification of the findings and conclusions.

It would unnecessarily extend this opinion to set out in full the trial court's findings and conclusions. Some of them deal with matters not in dispute. Many of them deal in detail with particular ballots and with individual electors. The trial court went carefully and fully into each case, permitted the ballots from precincts where irregularities were charged to be opened up, and made a determination in each case upon evidence as to whether the ballot should be counted or whether the individual casting the ballot was a legal elector. In its conclusions of law the trial court reviewed pertinent statutes and various decisions of this court. Some of the conclusions dealt with matters which, for reasons hereinafter to be stated, will not be discussed. It will suffice, therefore, to include here only certain extracts:

"FINDINGS OF FACT

. . . . . . . . . . . .

"(4) An election was held on January 20, 1947, and the Board of County Commissioners on January 25, 1947, 'met and found that there were 1311 ballots cast, 784 for, 522 against, 5 void and that "Yes" win by 60% of the votes cast. Maggie Tipton, county clerk, issued a Certificate of Election

stating that the Board of County Commissioners, sitting as a Board of Canvassers on January 25, 1947, declared Elkhart duly elected and selected county seat of Morton County, Kansas, at an election held on January 20, 1947.'

. . . . . . . . . . . . .

"(38) The total 'Yes' vote, or the vote favoring the removal of the county seat to Elkhart, is 780; the total 'No' vote is 515. The Board of County Commissioners found 5 void ballots and the court accepts this finding. Four of these ballots had marks in the square opposite the word 'Yes.' And one ballot had a mark in the square opposite the word 'No.' There were also 5 illegally marked ballots—4 of these marks were in the 'Yes' squares and 1 was in the 'No' square. This makes a total of 10 void ballots. There were 3 illegal votes cast by legal and qualified electors of Morton County (Milburn, Meyers and Morgan). Two of these ballots had crosses in the 'No' squares. There is no evidence as to how the Morgan vote was marked. 5 persons voted who were not electors of Morton County (Bressler, 2 Claytons, 2 Sullivans). There were on January 20, 1947, in Morton County, 1307 qualified legal electors;

"There were 1294 valid votes cast by electors of Morton County; if the Morgan vote was a 'Yes' vote then there were only 779 valid 'Yes' votes. If the Morgan vote was a 'No' vote there were 780 valid 'Yes' votes. Either 779 valid 'Yes' votes or 780 valid 'Yes' votes is more than ⅗ of the total votes cast, but this was not three-fifths of the legal electors of Morton County."

"Conclusions of Law

. . . . . . . . . . . . .

"G. S. 1945-Supp. 19-1602 requires 'a vote of three-fifths of the legal electors' of Morton County to remove the county seat to Elkhart. This section requires an affirmative vote to relocate of three-fifths of all the legal electors and a three-fifths favorable vote of those actually voting is not sufficient to relocate unless this is a three-fifths vote of all the legal electors.

"The Constitution of the State of Kansas (Article 9, Section 1) provides the first rule for the removal of county seats. 'The legislature shall provide for . . . locating county seat, . . . that no county seat shall be changed without the consent of the majority of the electors of the county.'

"The Constitution uses the words 'electors' and not 'voters.' The words are not the same. Electors means persons entitled to vote while voters means persons entitled to vote and persons actually voting. (*Clayton v. Hill City*, 111 Kan. 595 at 596.)

"A majority of the electors under the Constitution must consent to the change before a change can be made (County seat of Linn County, 15 Kan. 500 at 527), silence is not consent (*In re* Davis, 62 Kan. 231)."

. . . . . . . . . . . . .

"The plaintiffs without alleging any special interest may under Sec. 25-1507 of G. S. contest any preliminary steps necessary for the calling of the county seat election and included in this is the order of the county commissioners for an election."

. . . . . . . . . . . . .

"(4) The Board of County Commissioners on January 25, 1947, found that at the election held on January 20, 1947, there were '1311 ballots cast; 784 for,

522 against, 5 void and that 'Yes' win by 60% of the votes cast and declared Elkhart duly selected county seat.' *This canvass showed 1311 legal electors of Morton County; 1311 electors approved by the election boards and 1311 electors approved by the Board of County Commissioners.* Three-fifths of 1311 is 786.6 and 784 'Yes' votes is not three-fifths of 1311. The Board of County Commissioners should have found that the election failed to carry by a three-fifths vote of the electors of Morton County and the county seat should remain at Richfield. This record of the Board of County Commissioners was introduced in evidence the first morning of the trial. No application was made to the Court at the trial or after the trial for judgment in favor of Richfield on the above findings of the Board of County Commissioners." (Italics supplied.)

. . . . . . . . . . . . . . .

"(14) There were 1294 valid votes cast by legal electors of Morton County. If the Morgan vote was a 'Yes' vote then there were 779 'Yes' votes to relocate the county seat at Elkhart. If the Morgan vote was not a 'Yes' vote then there were 780 votes to relocate the county seat at Elkhart. If the Morgan vote was a 'No' vote then there were 514 'No' votes. If the Morgan vote was not a 'No' vote then there were 515 'No' votes. There were 11 void ballots. These are not to be counted in determining the number of votes cast.

"*The State v. Topeka,* 68 Kan. 177 at 189. "These 11 void ballots are to be counted in determining the total number of legal electors in Morton County as the names of the persons marking these ballots appeared on the Poll Books—they were accepted by the Election Boards as legal electors.

"There were 3 illegal ballots marked by legal electors of Morton County. These are not to be counted in determining the number of votes cast but are to be counted in determining the number of legal electors in Morton County.

"There were 1307 legal electors in Morton County on January 20, 1947, and the election failed to carry by a vote to relocate by three-fifths of all the legal electors of Morton County. The county seat will, therefore, remain at Richfield. "May 16, 1947.

"LORIN T. PETERS, J. P. T."

We first take brief note of appellees' contention that the appeal should be dismissed for the reason that necessary parties had not been made parties to the appeal. The contention is based upon the fact that while in the original action the county commissioners and six county officers, named individually, were made parties defendant, this appeal was taken only by the board of county commissioners and the clerk of the district court, and that no notice of appeal was served upon any of the other defendants. This contention need not be discussed at any length. None of the other defendants, who were not served with notice of the appeal, participated in the trial unless it may be said that the county clerk se

participated by virtue of having been called and having testified that she was the county clerk and, as such, had signed an affidavit, submitted as an exhibit, relating to the alleged filling of a vacancy in the office of county commissioner. G. S. 1935, 60-3306, which deals with appeals to this court, provides *inter alia* that a copy of the notice of appeal "must be personally served on all adverse parties whose rights are sought to be affected by the appeal, and who appeared and took part in the trial, or their attorneys of record; . . ." It is not at all clear that the other county officers are adverse parties, and in any event they did not participate—with the possible exception above noted—in the trial after the issues were framed. The board of county commissioners has charge of the property of the county, and the management of the business and concerns of the county in all cases where no other provision is made by law. (G. S. 1935, 19-212.) They were the only ones who were necessary parties to the action in the first instance. No grounds are shown for dismissing the appeal.

Appellants' first contention is that the plaintiffs were not entitled to bring the action. This requires examination of the statute. The action was brought under G. S. 1935, chapter 25, article 15, which is a special statute dealing with "contest of county-seat and certain other elections." The pertinent part of the first section of the act (25-1501) reads as follows:

"Whenever any elector or electors of any county, township or municipal corporation in this state *shall consider himself or themselves aggrieved* by the result of any election hereafter held for removing, locating, establishing or relocating the county seat of such county, . . . such election may be contested in the district court of the proper county, *as hereinafter provided.*" (Italics supplied.)

The two procedures thereinafter provided are mandamus (25-1502) and injunction (25-1505), the former being available to compel the removal of county offices, and the latter being available for enjoining such removal. In either case the parties bringing the action are required to give good and sufficient security for costs (25-1510). The clear intent of the act is to provide a contest proceeding in the district court to test the validity of the election. Section 25-1507 provides:

"In any action or proceeding commenced in accordance with the provisions of this act, the validity of the election upon which the relator bases his right to a writ of mandamus to compel the performance of a supposed official duty, or the plaintiff his right to enjoin or restrain the defendant or defendants from

doing or committing the act threatened, proposed or apprehended, shall be tried and determined; and the validity of any vote or votes cast or counted, or offered and refused, at such election, which vote or votes shall be designated in the petition or answer, shall also be determined; and every illegal vote so cast or counted shall be rejected by the court, and every legal vote so offered and refused shall be counted by the court: . . ."

It is the contention of appellants that only those electors may bring action under the statute who have a special or direct interest in the result of the election different from that which is common to taxpayers and electors generally, and that no such special interest was here shown. Our attention is called by appellants to several cases in which the word "aggrieved" is construed. As already noted, the statute provides that any elector or electors who *"shall consider himself or themselves aggrieved* by the result of any election" (italics supplied) may bring the action. It is true, as noted by appellants, that the mandamus section (25-1502) refers to those bringing the action as "person or persons aggrieved," and that the injunction section (25-1505) refers to them as those "who may be aggrieved." Clearly, these words relate back to the persons designated in the opening section (25-1501). There is no indication of any intent to modify that designation. Accordingly, we have before us simply the words "shall consider themselves aggrieved." This is very broad language. Moreover, and of primary importance, the words must be construed in the light of the legislative intent. We think it is clear that the legislature intended, by this contest statute, to provide a judicial review by electors of the county who feel aggrieved by what they believe to be an election result unlawfully determined, and who desire to contest the validity of the proceedings. It is difficult to imagine what electors would be entitled to bring action under the statute if we were to adopt the view of appellants. No illustrations have been suggested to indicate the sort of special pecuniary interest they think the statute contemplates. The location of a county seat is a matter of a common public interest. Some persons might be more inconvenienced than others by removal by virtue of distance or other similar reasons. Some private property values might be affected, but surely an asserted impairment of such values at the old location would not constitute legal basis for action to enjoin removal, and much less would asserted enhancement of values by property owners at the new location constitute grounds for mandamus—to which the words "consider themselves aggrieved" equally apply—

to compel removal. Appellants' construction would leave few, if indeed any, situations where there would be electors who would be entitled to bring action. Its adoption would, in our opinion, virtually nullify the purpose and operation of the contest statute.

Disregarding the controlling words "consider themselves aggrieved," appellants cite several cases construing the word "aggrieved." The cases cited involve, generally, the meaning of the word "aggrieved" in statutes providing for *appeals*. The cited cases are *Clark v. Warner*, 85 Okla. 153, 204 Pac. 929; *Ely v. Frisbie*, 17 Cal. 250; *Wiggin, Administrator, v. Swett*, 6 Metc. (Mass.) 194, 39 Am. Dec. 716; *Morath v. Gorham*, 11 Wash. 577, 40 Pac. 129, and *Lawry v. County Commissioners*, 12 Wash. 446, 41 Pac. 190. In the Warner case, stressed in appellants' brief, the county board allowed a claim of $11,700 toward the building of a bridge, part of the expense of which was to be borne by the Federal government and part by the county. A taxpayer sought to appeal from the allowance of the claim under a statute providing for appeals from decisions of the board by persons aggrieved. Interpreting their statute, the Oklahoma court said that persons aggrieved meant "parties to the action—the real parties in interest" and that "the one aggrieved is the one against whom a judgment or decision is rendered or order made." Obviously, an appeal statute relating to the allowance or disallowance of a claim would be applicable only to those directly involved. We are not dealing with such an issue here. We are dealing with a special statute providing for a contest in court of elections for relocation of county seats.

The Ely case, *supra*, a California case, involved an appeal from an order enjoining the enforcement of a judgment recovered by the defendants for the possession of property occupied by the plaintiffs. Third persons claiming title attempted to take an appeal under a statute which provided that "parties aggrieved" are entitled to appeal. The court simply said that the words "parties aggrieved" were limited to those against whom an appealable order or judgment had been entered. The Wiggin case, *supra*, is of the same character. It simply held that parties "aggrieved" by a judgment are, under an appeal statute, persons who were parties to the judgment. The Morath case, *supra*, is also not persuasive here. It held that persons aggrieved by a decision of the county commissioners by action taken on a claim were persons directly interested in the claim, and not taxpayers generally. Appellants do not discuss the

Lawry case, *supra,* but simply say that it was "a county seat case." In that case, county commissioners took action under a special statute which gave them certain powers relative to the removal of county seats. There was no provision in the statute for an appeal from their decision. A taxpayer attempted to appeal under the general appeal statute. Following the well established rule, the court said that there was no inherent right of appeal; that such right did not exist in the absence of statutory provision for it, and that the general appeal statute did not apply. No contest statute such as we have here was involved.

The plaintiffs being electors of the county and considering themselves aggrieved were entitled to bring this action to test the validity of the election and the relocation order made by the county commissioners. In such a proceeding, any matter affecting the validity of the election may be investigated and determined. (*State v. Barton,* 58 Kan. 709, 51 Pac. 218, syl. ¶ 1, and cases cited, p. 711.)

We pass to a consideration of the principal substantive question presented. The statute provides that the county seat may be moved only by an affirmative vote of "three-fifths of the legal electors" of the county. The question is how is the number of legal electors to be determined? Appellants contend that it is sufficient if three-fifths of the votes lawfully cast favor the proposition. Under that view the meaning of the statute would be construed as though it read "three-fifths of the *votes lawfully cast.*" But the statute says "three-fifths of the *legal electors* of the county." (Italics supplied.)

Both parties cite the early case of *County-Seat of Linn Co.,* 15 Kan. 500. The statute existing in 1875 when the Linn county case was decided provided that a majority of the votes cast was sufficient. The statute was attacked on the ground that it violated section 1, article 9 of the constitution, which provides in part that "the legislature shall provide for organizing new counties, locating county seats, and changing county lines; but no county seat shall be changed without a consent of a majority of the electors of the county." There was then no statute providing any guide in determining the number of electors of the county. It was held that the statute under attack constituted a reasonable exercise of power by the legislature in determining the number of electors necessary; that in the absence of any other statutory means for making such a determination, it was not a violation of the constitution to treat the *votes cast* as determining the number of legal electors. It was said in the opinion, written by Justice Brewer:

"It seems to us therefore, that where the legislature has provided *an election* as the means of ascertaining the wishes of the electors of a county in reference to a change of the county-seat, and has made no provision for a registration, and has designated no other list or roll as the evidence of the number of electors, it may, under the constitutional provision quoted, declare that the place receiving a majority of *the votes cast* shall be the county-seat." (p. 530.)

In 1881 the legislature took note of the situation and passed an act for "registration of electors for location or relocation of county seats" (Laws 1881, ch. 89). That statute, as subsequently amended, now constitutes G. S. 1935, 19-1613 to 19-1630, inclusive. In 1883, the statute dealing with location or relocation of county seats was amended by adding the provision that "no preceding nor pretended election for the relocation of any county seat had or held since the taking effect of chapter 89 of the Session Laws of 1881 shall be deemed or held to have been an election within the meaning of this act unless registration was had as required by the terms of said chapter 89." (See G. S. 1945 Supp. 19-1602.) While the record here does not specifically so state, it contains various references to registered electors and we shall assume that the registration act was complied with. If not so complied with the election would have been invalid under the provision just noted.

Briefly summarized, this special registration law provides that judges of elections shall constitute the board of registry for their respective voting precincts; that they shall meet three weeks preceding any election for the permanent location or relocation of county seats and make a list of all persons qualified and entitled to vote at the ensuing election, and this list shall constitute an election register (19-1613); the election boards shall enter on said list the names of persons residing in the precinct whose names appear on the poll book of the precinct at the last preceding election. In addition to those names the board shall enter the names of all other persons who are well known by them to be qualified electors of the precinct and shall strike from the poll book lists the names of those who have died or have removed from the precinct. Each of the judges shall keep a copy of the list so prepared for his use on the day provided for revision of the list, and one copy shall be posted in some conspicuous place where the election is to be held in the precinct and be accessible for examination by any elector who may desire to examine it. (G. S. 1935, 19-1614.) On Tuesday of the week preceding the election, the board shall meet in their respective voting precincts for the purpose of revising, correcting,

and completing these lists. (G. S. 1935, 19-1616.) The proceedings of the board shall be opened and all persons residing and entitled to vote in the precinct shall be entitled to be heard in relation to corrections or additions to the register. (G. S. 1935, 19-1617.) Section 19-1618 relates to procedure and evidence to be received in the revision and correction of these registration lists. After the registration lists have been fully completed within three days of the second meeting of the board, four certified copies of the lists must be made, one of which shall be filed with the township clerk, and one of which shall be delivered to each of the judges. The judges shall preserve these lists for use on election day and designate one of their number at the opening of the polls to check the name of every voter voting whose name is on the register. No vote shall be received if the name of the person offering to vote is not on the register unless he furnishes an affidavit stating that he is an inhabitant of the precinct entitled to vote therein, and also furnishes an affidavit of a householder and registered voter of the precinct that he knows such person to be an inhabitant of the precinct. Any person whether his name be on the list or not may be challenged by the judge or any legal elector. (G. S. 1935, 19-1619.) After the canvass of the votes the poll books and the register shall be attached together and filed on the following day with the township clerk and a duplicate returned to the county clerk. (G. S. 1935, 19-1621.)

This synopsis of the registration law has been made to show with what detail the legislature has provided for establishing a list of those entitled to vote on proposals to locate or relocate county seats. The statute does not specifically state that the total number of persons shown on the final registration lists shall constitute the total number of legal electors for the purpose of determining whether the required percentage has voted in favor of the proposal. But it does provide that no person shall be entitled to vote whose name is not on the registration list, except as hereinbefore noted.

We find no statement in the record as to the total number of persons whose names were on the registration list. It seems entirely improbable that a ballot was cast by every person on such list. However, in determining the total number of legal electors, the trial court did not include any persons on the registration list who did not cast a ballot. After hearing evidence upon all contested individual cases, it excluded from the votes cast and from the

number of legal electors a number of persons who did cast ballots but who were not legal electors on account of change of residence or for some other such valid reason. It included in the total number of legal electors those properly on the registration list and entitled to vote and who voted but whose ballots were invalid.

It might be argued (see, however, what was said, as hereinafter noted, in *Patrick v. Johnson,* 90 Kan. 140, 133 Pac. 161) that all persons properly on the registration list whether voting or not should be included in determining the number of legal electors of the county. We do not here pass upon that question. If there were legal electors on the registration list who did not vote, the inclusion of such persons in the total number would reduce the percentage of the affirmative votes. In other words, the inclusion in the total number of legal electors of only those casting ballots was to the advantage of appellants.

Under the findings hereinafter noted either by the board which ordered removal, or by the trial court which enjoined removal of the county seat, appellants can prevail only by a construction of the statute which makes three-fifths of the votes cast equivalent to three-fifths of the legal electors of the county. We cannot adopt that construction.

In *In re Davis,* 62 Kan. 231, 61 Pac. 809, the court construed a statute creating a special court to serve Cherokee and Crawford counties. The statute provided that the proposal must receive "a majority of the electors in each of the counties . . . voting at such election." The proposal received a majority of those voting on the proposition but not a majority of electors voting at the same election on all candidacies and on other propositions then submitted. It was held that a majority of the votes cast only on the particular proposition was insufficient.

*Gardner v. State,* 77 Kan. 742, 95 Pac. 588, dealt with a statute relating to consolidation of school districts, the statute providing that a majority of the voters in the district must vote for the proposition. It was held that "a majority of those who attend the meeting is not sufficient, unless that also be a majority of the voters in the district."

*Patrick v. Johnson,* supra, involved a proposal to remove the county seat of Haskell county from Santa Fe to Sublette. It was alleged that the registration list contained the names of 513 persons, 427 of whom voted, 245 in favor and 182 against. Sixty percent

of 427 would be 256.2, but it was contended on behalf of Sublette that a majority of the votes cast was sufficient, and that a provision requiring a three-fifths vote was void. The contention was rejected. It may be here noted that in the syllabus it was stated that "it is not essential that three-fifths of those whose names appear on the registration list shall thus vote." That question, however, was not necessary to a decision under the facts of the case. The issue presented and decided was stated as follows in the closing paragraph of the opinion:

"The act of 1883 provides that 'it shall require a vote of three-fifths of the legal electors of such county to relocate the county seat and remove it from such place.' (§ 1.) Whether or not this necessitates a favorable vote by three-fifths of all the legal electors of the county, it certainly does require a favorable vote by three-fifths of those actually voting on the question, and means the same as if it read, 'it shall require a vote to relocate by three-fifths of the legal electors.' As Sublette failed to obtain the required vote, the county seat cannot be removed." (p. 147.)

*Clayton v. Hill City,* 111 Kan. 595, 207 Pac. 770, involved construction of a statute which required a vote of the majority of the "qualified electors" of the city before certain bonds could be issued. In the opinion by Justice Mason in which many cases were reviewed, it was said:

"Where a popular vote is required to authorize certain action a majority (or other stated proportion) of those actually voting is regarded as sufficient for the purpose, unless the statute affirmatively and clearly shows a different intention. But we regard the language quoted as too explicit to admit of any other construction than that the bonds referred to shall not be issued without the consent, expressed by voting at the election, *of a majority of all the persons lawfully entitled to vote thereat.* . . . Nearly all the many Kansas statutes regarding special elections provide in so many words that the result shall be determined by a majority (or other proportion) of the votes cast. A provision that a majority of the qualified electors shall be necessary is so unusual as clearly to indicate a purpose to apply a different rule. The use of the word 'electors' rather than 'voters' tends to the same conclusion." (pp. 595, 596.) (Italics supplied.)

*State, ex rel., v. Dunn,* 118 Kan. 184, 235 Pac. 132, involved a proposal to abandon the city manager form of government at Wichita and required interpretation of the words "qualified electors" used in the statute. In the opinion it was said:

"The first question is, Who are 'qualified electors' within the meaning of the statute? It is well settled in this state that the legislature may require registration as a prerequisite to the right to vote. (*The State v. Butts,* 31 Kan. 537, 2 Pac. 618.) In the cities where registration is required, *an elector is a*

*person having the constitutional qualifications of an elector and who is duly and properly registered.* (*Coney v. City of Topeka,* 96 Kan. 46, 149 Pac. 689.) In *Clayton v. Hill City,* 111 Kan. 595, 207 Pac. 770, the term '*qualified electors*' *was construed to mean persons entitled to vote.* Hence the words 'qualified electors' in this statute means persons who have the constitutional (Const., art. 5, §§ 1, 4) qualifications of an elector and who are duly and properly registered." (pp. 186, 187.) (Italics supplied.)

To hold that three-fifths of the valid votes cast is sufficient in the instant case would do plain violence to the evident intent and the plain terms of the statute. It was necessary that the proposal receive the affirmative vote of at least three-fifths of the registered and qualified electors who cast ballots at the election. The fact that some of them may have improperly marked their ballots did not keep them from being qualified electors.

The board found that there were 1,311 ballots cast, of which 784 were for and 522 against, and five were void. The canvass showed 1,311 legal electors approved by the election board, and by the county board. On these figures the board held that sixty percent had voted for the proposal. They could reach this conclusion only by subtracting from their 1,311 approved electors the number five, which represented the ballots which they had found to be void. Even upon the figures found by the board, its conclusion was erroneous. The five ballots found to be void, because improperly marked, were cast by persons which the board itself had found to be legal electors. Sixty percent of 1,311 is 786.6, whereas the board found only 784 affirmative votes had been cast.

The trial court after hearing evidence reduced the number of legal electors as found by the board from 1,311 to 1,307, and upon competent evidence, found that there were 1,294 valid votes cast by the legal electors. It properly held that void ballots cast by legal electors were not to be counted in determining the number of votes cast but were to be counted in determining the total number of legal electors, their names appearing on the registration books and being accepted by the election boards as legal electors. The trial court found upon substantial evidence that there were either 779 or 780 votes lawfully cast to relocate the county seat. In either event, the number was insufficient.

There remains for consideration appellants' contention that the entire vote in East Richfield and Rolla precincts should have been rejected because of irregularities. In each case the trial court permitted the envelope containing the precinct ballots to be opened

up upon application of the appellants. It developed that in each precinct there was one ballot cast by an elector who was ill at home and to whom a ballot was taken by election officials, marked, returned and deposited. The elector Meyers whose vote was thus taken in the East Richfield precinct, was still bedfast at the time of the trial and his testimony could not be secured. The court found upon circumstantial evidence that he voted "No" and held that his ballot should not be counted. The ballot in question in Rolla precinct was cast by a Mrs. Morgan who was deceased at the time of the trial. There was no evidence as to how she had voted. There was no other contention as to ballots improperly counted in these precincts and there was no contention or any evidence that the irregularities of which complaint was made affected the result except as already noted. No matter how the two votes or voters in these two instances are counted, it does not change the result.

Appellants call attention to certain irregularities found in the East Richfield precinct, such as failure to file the duplicate poll book in the office of the township clerk; at the time the polls were open only the township trustee and two clerks were present; the judges arrived late; in the afternoon the blinds were pulled down and motion pictures were shown; a small child was permitted to drop a scrap of paper in the ballot box. There was no evidence of any tampering with the ballot boxes or that the results of the election were affected by the irregularities, and the reopening and counting of the ballots in these two precincts developed nothing to throw any cloud upon the vote. It is well settled that mere irregularities in conducting an election which do not cast any uncertainty on the result, do not, in the absence of fraud, require rejection of the entire vote. (*Washburn v. Board of Education,* 126 Kan. 661, and cases cited p. 663, 270 Pac. 609; *State, ex rel., v. City of Lawrence,* 98 Kan. 808, 811, 812, 160 Pac. 217; *Jones v. Caldwell,* 21 Kan. 186.)

The conclusions just stated make it unnecessary to consider appellants' second contention as stated in the opening part of this opinion. Other incidental contentions have been fully considered but need not be treated, as they are disposed of by what has already been said.

We find no error and the judgment is affirmed.

COWAN, J., not participating.